UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
QUALITY HEALTH PLANS OF NEW
YORK INC., SAFIA KHAN, SABIHA
H. KHAN, FRANCIS OLSEN, ARAIN
NAWAZ, RICHARD CLARK, and
TIMOTHY SCOTT,

                                      **REPORT AND
RECOMMENDATION**

                 Plaintiffs,          CV 20–3563 (JS)(AYS)

        -against-

IRONSHORE SPECIALTY INSURANCE
COMPANY,

                       Defendant.
-----------------------------------------------------X

**ANNE Y. SHIELDS, United States Magistrate Judge:**

      Corporate Plaintiff Quality Health Plans of New York Inc. ("QHPNY") and individual

Plaintiffs Safia Khan, Sabiha H. Kahn, Francis Olsen ("Olsen"), Arain Nawaz ("Nawaz"),

Richard Clark ("Clark"), and Timothy Scott ("Scott") (the "Individual Plaintiffs") (collectively

with QHPNY the "Plaintiffs") commenced this declaratory judgment action against Defendant

Ironshore Specialty Insurance Company ("Ironshore" or "Defendant"). See Docket Entries

herein ("DE") [1] and [27-1]. Plaintiffs seek a judgment declaring that Defendant owes them a

duty to defend pursuant to the terms of two insurance policies. Id. The lawsuit for which

Plaintiffs seek a defense was brought in the Nassau County Supreme Court of the State of New

York (the "Underlying Lawsuit"). DE [27-7]. The Underlying Lawsuit, (also referred to herein as

"the Second Northwell Action or Northwell II"), is the second of two lawsuits commenced by

Northwell Health, Inc. ("Northwell"). The first such lawsuit, (referred to herein as "the First

Northwell Action or Northwell I"), DE [27-10], names only QHPNY as a defendant; the second

1

is brought by Northwell in its own capacity as well as in its capacity as the assignee of certain claims acquired as a result of QHPNY's liquidation. DE [27-7] at ¶ 2. It names the parent company of QHPNY, as well as the Individual Plaintiffs and related corporate entities as defendants. See DE [27-2] at ¶¶ 3-28. Both lawsuits seek amounts stated to be due to Northwell for providing health care services to members of QHPNY's managed care health plan. The Court refers herein to the two lawsuits commenced by Northwell collectively as the "Northwell Actions". Defendant Ironshore asserts a counterclaim seeking a declaratory judgment in its favor that the two insurance policies do not provide coverage. DE [27-3].

Presently before this Court, upon referral by the Honorable Joanna Seybert for Report and Recommendation, see Order dated 10/31/2022, are the parties' cross-motions for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c) ("Plaintiffs' Motion" and "Defendant's Motion," or, collectively, the "Motions"). See Pls.' Mot., DE [27]; Def.'s Mot., DE [28]. As discussed below, this Court respectfully recommends that Defendant's motion be granted, and that Plaintiffs' motion be denied.

BACKGROUND

I.     Factual Background

A.     The Parties

QHPNY is a New York company located in Ronkonkoma, New York that provides Medicare Advantage health insurance coverage. Complaint ("Compl.") ¶¶ 3, 12, DE [1-1]. Plaintiff Safia Khan, Sabiha H. Khan, Olsen, Nawaz, Clark, and Scott are all former directors, officers, or employees of QHPNY. Compl. ¶¶ 4-9. Defendant Ironshore is a corporation authorized by the state of New York to issue insurance policies in New York. Compl. ¶ 10.

B.     The Northwell Actions

In March 2019, Northwell filed the First Northwell Action against QHPNY to recover amounts owed for healthcare services rendered. See Northwell Health Inc. v. Quality Health Plans of New York, Inc., Index No. 602756/2019 (Supreme Court of New York, County of Nassau). Counterclaim ¶ 6, DE [4]; Counterclaim Ex. C, DE [4-3]. The Northwell I names only QHPNY as a defendant and alleges that it failed to pay Northwell for the medical care and treatment of QHPNY's cardholders, members and/or insureds pursuant to a Provider Agreement. Counterclaim ¶ 6. In that action, Northwell asserts causes of action for breach of contract, breach of third-party beneficiary contract, unjust enrichment, quantum meruit, and accounts stated. Id. ¶ 7. Northwell alleges that it is owed not less than $18,548,932.68 from QHPNY. Id. ¶ 6.

In February 2020, Northwell filed the Second Northwell Action, another lawsuit aimed at recovering the same amounts owed by QHPNY as sought in the First Northwell Action. See Northwell Health, Inc. v. Khan, et al., Index No. 602464/2020 (Supreme Court of New York, County of Nassau). Compl. ¶ 15; Counterclaim ¶ 10. As noted, Northwell II is brought by Northwell in its own capacity, as well as in its capacity as the assignee of claims acquired as a result of QHPNY's liquidation. DE [27-7] at ¶ 2. It names the parent company of QHPNY, as well as the Individual Plaintiffs and related corporate entities as defendants therein. DE [27-2] at ¶¶ 3-28, Like the First Northwell Action, the Second Northwell Action seeks recovery of amounts due for the provision of healthcare services.  In support of claims alleged against the newly named Individual Plaintiffs and related corporate entities (defendants in Northwell II) Northwell alleges facts to support claims sounding in fraud and breach of duty. Specifically, in Northwell II, Northwell claims that from 2014 through the end of 2019, QHPNY did not have a positive net worth and owed Northwell over $5 million by the end of 2017. Counterclaim ¶ 10. Northwell alleges that despite representations by Safia Khan that Northwell would be paid,

QHPNY owed Northwell $18,548,932.68 by the end of 2018 - the same amount sought in the First Northwell Action Id. ¶ 10. Northwell further alleges that QHPNY and certain individuals, including the Individual Plaintiffs herein, stripped QHPNY's assets so that it would be judgment-proof and unable to pay its bills. Id. ¶ 10. The causes of action in Northwell II are for piercing corporate veils, fraudulent transfers, breach of fiduciary duty, fraud, unjust enrichment, and conversion. Counterclaim ¶ 11; Counterclaim Ex. D, ¶¶ 11, 18-19, 22, 25-26, 31-32, DE [4-4].

C.   The Insurance Policies

QHPNY purchased a managed care organization directors and officers  ("D&O) liability policy from Ironshore for the time period covering December 1, 2018 through December 1, 2019 (the "2018 D&O Policy"). Compl. ¶ 19; Counterclaim ¶ 5; Counterclaim Ex. A ("2018 Policy"), DE [4-1]. In December 2019, Ironshore issued QHPNY a renewal D&O policy for the time period covering December 1, 2019, through December 1, 2020 (the "2019 D&O Policy"). Compl. ¶ 33; Counterclaim ¶ 8; Counterclaim Ex. B ("2019 Policy"), DE [4-2]. Certain terms and exclusions of the D&O policies issued by Ironshore to QHPNY (collectively the "Policies") are relevant to this dispute. Where such terms are the same, the Court cites only to the 2018 D&O Policy. Where the Court refers only to a particular policy, that referenced is noted. Policy definitions of relevant terms follow.

An "Insured Person" is defined under the Policies as "any past, present or future director, officer, member manager, trustee, employee (including but not limited to any leased employee), member of staff, faculty or duly constituted committee, or volunteer of any Insured entity." Compl. ¶ 21; Pls.' Mot., Ex. 3, § II(K), DE [27-4]. No one disputes that Plaintiffs herein are insured under the Policies.

4

A "Loss" is defined under both Policies as "Defense expenses and any monetary amount which an Insured is legally obligated to pay as a result of any Claim," including but not limited to "reasonable and necessary fees and expenses incurred in the defendant or appeal of any Claim" and "pre- and post-judgment interest awarded or imposed in any judgment." Compl. ¶ 22; Pls.' Mot., Ex. 3, § II(L). There is no dispute as to whether such defense expenses for the Northwell Actions, if covered, would fall within this definition.

A "Claim" is defined under both Policies, in part, as "any civil proceeding in a court of law or equity, including any appeal therefrom, which is commenced by the filing of a complaint, motion for judgment or similar proceeding." Compl. ¶ 23; Pls.' Mot., Ex. 3 § II(B)(2). Thus, a lawsuit is a claim under the Policies. It is clear that lawsuits such as the Northwell Actions are claims within the meaning of the Policies.

"Defense Expenses" consist of "reasonable and necessary legal fees and expenses incurred in the defense or appeal of a Claim." Pls.' Mot., Ex. 3, § II(D). There is no dispute as to whether such expenses for the Northwell Actions, if covered, would fall within this definition.

A "Wrongful Act" is "any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by any Insured Entity or by any Insured Person in his or her capacity as such; any matter asserted against any Insured Person solely by reason of his or her status as such." Pls.' Mot., Ex. 3, § II(Y). The acts alleged in the Northwell Actions fall within this definition.

The Policies provide coverage only when a claim is "first made" during the coverage term of a policy, which is referred to as the policy's "Policy period". See, e.g., 2018 Policy, Section 1. As referenced above, the policy period for the 2018 D&O Policy is December 1, 2018 through December 1, 2019; the policy period for the 2019 D&O Policy is December 1, 2019

through December 1, 2020. Accordingly, if a claim is "first made" during the time period between December 1, 2018 and December 1, 2019, it would fall under coverage, and be subject to exclusions of the 2018 D&O Policy. If, on the other hand, a claim is "first made" during the time period between December 1, 2019 and December 1, 2020, it would fall under coverage, and be subject to exclusions of the 2019 D&O Policy. As noted, a lawsuit is a "claim" under the Policies.

Section IV(B)(3) of the Policies explain how to determine when a claim is "first made" and speaks to when a claim is deemed "related" to an earlier claim made. If a claim is indeed related to an earlier claim, it is the date of the first claim that governs when the claim is "first made" for purposes of determining whether a claim falls within a policy period. This is important here because if a lawsuit was commenced during the 2019 D&O Policy period, but is related to a claim made during the 2018 D&O Policy period, the terms and exclusions of the earlier policy period, i.e., the 2018 policy period, apply. The related claims provision of the 2019 D&O Policy, which governs such a situation, provides that:

> [a]ll Claims that constitute Related Claims as set forth in Section II Definitions (U), whenever made, shall be deemed to be a single Claim and shall be deemed to have been first made on the earliest of the following dates:
>
> (a)   the date on which the earliest Claim within such Related Claims was received by an Executive Officer or the Insured; or
>
> (b)   the date on which written notice was first given to the Underwriter of a Wrongful Act which subsequently gave rise to any of the Related Claims, regardless of the number and identity of claimants, the number and identity of Insured involved, or the number and timing of the Related Claims, even if the Related Claims comprising such single Claims were made in more than one Policy Period.

Counterclaim ¶ 15; Pls.' Mot., Ex. 3, § IV(B)(3). The 2019 D&O Policy defines in relevant part, Related Claims in Section II(U) broadly to mean:

> all claims for Wrongful Acts based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events, whether related logically, causally or in any other way . . . .

Counterclaim ¶ 16; Pls.' Mot., Ex. 3, § II(U) (together with § IV(B)(3) the "Related Claims Provision").

The Policies contain several relevant exclusions upon which Ironshore relies to avoid coverage. The "Insolvency Exclusion" bars coverage for "Loss, including Defense Expenses, from any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving <u>any actual or alleged</u>: (1) <u>insolvency</u>, bankruptcy, conservatorship, rehabilitation, receivership, liquidation, <u>or financial inability to pay</u> of: (a) any Insured acting as an insurer or reinsurer . . . ." Counterclaim ¶ 22; Pls.' Mot., Ex. 3, Endorsement No. 4 at p.24.[1] The "Managed Care Services Exclusion" bars coverage for "loss, including Defense Expenses, from any Claim based on, arising out of, directly or indirectly resulting from, or in any way involving:

> Any actual or alleged act, error or omission in the performance of, or failure to perform, any Managed Care Services by any Insured or by any individual or entity for whose acts, errors or omissions any Insured is legally responsible . . . .

Counterclaim ¶ 23; Pls.' Mot., Ex. 3, § III(C)(5). Managed Care Services are defined to include "any services or activities performed in the administration or management of health care." Counterclaim ¶ 22; Pls.' Mot., Ex. 3, § II(M). The "Contract Exclusion" bars coverage for "Loss, including Defense Expenses, from any Claim:

> For any actual or alleged liability of any Insured Entity under any express contract or agreement, unless such liability would have attached to such Insured Entity in the absence of such express contract or agreement. For purposes of this Exclusion (D)(4), an "express contract or agreement" is an actual agreement between or

---

[1] For ease of reference, page numbers referenced herein are numbers assigned to pages on electronically filed documents, and not to the underlying documents themselves except for page numbers referenced in cases.

among the contracting parties, the terms of which are openly stated in distinct and explicit language, either orally or in writing, at the time of its making . . . .

Counterclaim ¶ 24, Pls.' Mot., Ex. 3, § III(D)(4).

     D.     <u>Plaintiffs' Request for Coverage and Ironshore's Denial</u>

The Individual Plaintiffs and their related entitled provided notice of the Second Northwell Action to Ironshore on March 24, 2020, requesting that the insurer provide a defense and indemnification. Compl. ¶¶ 27, 42. Thus, both the commencement of this second lawsuit by Northwell, and Plaintiffs' notice thereof to Ironshore both took place during the 2019 D&O Policy's policy period. As to the earlier filed First Northwell Action, there is no question raised as to the facts that the lawsuit was commenced, and QHPNY first learned of it, during the 2018 D&O Policy's policy period.

By letter dated April 30, 2020, Ironshore denied coverage for the Second Northwell Action.  Pls. Mot., Ex. 8, DE [27-9].[2] In its denial letter Ironshore asserted, <u>inter</u> <u>alia</u>, that the Northwell II is a related claim to Northwell I, commenced in February 2019. <u>Id.</u> Thus, Ironshore characterized the actions as "related claims" under the 2019 D&O Policy, which were first made during the policy period of the 2018 D&O Policy. <u>Id.</u> Therefore, Ironshore asserted that the Second Northwell Action was not covered by the 2019 D&O Policy, and the Individual Plaintiffs' March 2020 notice was not timely. <u>Id.</u>

Ironshore thus denied coverage under the related claims clause in the 2019 D&O Policy, but also analyzed the demand for coverage under the 2018 D&O Policy, which was in effect at the time the First Northwell Action was commenced. Ironshore then declined coverage on the grounds (common to both Policies) of the insolvency, managed care, contract and other exclusions. <u>Id.</u> It

---

[2]  Ironshore also declined coverage under an "Errors and Omissions" policy, which is not at issue here.

also asserted other grounds applicable to some, but not all of the defendants named in Northwell
This action followed.

II.    Procedural History

Plaintiff commenced its action seeking coverage in July 2020 in New York State
Supreme Court, Nassau County. See DE [1]. On August 7, 2020, the case was removed to this
Court based on the Court's diversity jurisdiction. Id. On August 14, 2020, Ironshore filed its
Answer and asserted its declaratory judgment counterclaim. DE [4].

The undersigned scheduled an initial conference for December 9, 2020. See DE [6]. In a
letter request seeking an adjournment of the scheduled conference, it became clear that QHPNY
had been placed in New York State liquidation proceedings. DE [9]. Counsel requested an
adjournment of the conference for inter alia, procedural matters at issue in the Northwell
Actions. Id. The undersigned granted the request and adjourned the initial conference to
February 17, 2021. See Electronic Order dated 12/04/2020. The same adjournment request was
again made regarding the scheduled February initial conference, and the subsequently scheduled
May 2021 conference. DE [11], [12]. The undersigned granted both adjournment requests,
providing a June 22, 2021 initial conference date. See Electronic Order dated 02/12/2021; See
Electronic Order dated 05/21/2021. A fourth adjournment request was made and similarly
granted with regard to the June 22, 2021 conference date. See DE 13; See Electronic Order dated
06/19/2021. The conference was finally held on September 29, 2021 and counsel for the parties
appeared, as did QHPNY's appointed liquidation counsel. See Scheduling Order dated
9/29/2021. A further conference was scheduled for October 27, 2021. Id.

On January 17, 2022, Plaintiffs requested a pre-motion conference in anticipation of
filing a motion for judgment on pleadings. DE [18]. Defendant requested the same in their

January 24, 2022 letter. DE [19]. On February 10, 2022, the District Court deferred ruling on the parties' requests until after reviewing the parties' responses to the Court's question of whether the matter should be stayed pending a resolution of the Second Northwell Action. See Electronic Order dated 02/10/2022. On March 9, 2022, after reviewing the parties' submissions, the District Court waived its pre-motion conference requirement, granted the parties leave to file cross-motions for judgment on the pleadings and issued a briefing schedule. See Order dated 03/09/2022. On May 27, 2022, Plaintiffs filed a motion for judgment on the pleadings. See DE [27]. On June 30, 2022, Defendant filed their opposition and cross-motion for judgment on the pleadings. See DE [28]. On October 31, 2022, the Honorable Joanna Seybert referred the motions to the undersigned for Report and Recommendation. See Electronic Order Referring Motion dated 10/31/2022.

III.    The Motions

Plaintiffs seek a declaratory judgment that Ironshore is obligated to provide them with a defense to the Second Northwell Action, and to reimburse them for all expenses incurred to date. Defendant seeks a judgment declaring that coverage is not available. The Court turns to the merits of the motions.

DISCUSSION

I.    Legal Principles

A.    Standards Applicable To Rule 12(c) Motions for Judgment on the Pleadings

To prevail on a 12(c) motion, a party must establish that no material facts are in dispute and that judgment must be granted as a matter of law. See Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Nieves v. Comm'r of Soc. Sec., No. 17-CV-6844, 2019 WL 5722272, at *10 (S.D.N.Y. Aug. 9, 2019). "In deciding a Rule 12(c) motion, [the Court]

employ[s] the same standard applicable to dismissals pursuant to Rule 12(b)(6)." L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 429 (2d Cir. 2011) (citation, alterations, and quotation marks omitted).

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." Id. (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555, 127 S. Ct. 1955. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," id. at 563, 127 S. Ct. 1955, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," id. at 570, 127 S. Ct. 1955, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," id.; see also Iqbal, 556 U.S. at 679, 129 S. Ct. 1937 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader

is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); id. at 678–79, 129 S. Ct. 1937 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007), and "draw[ ] all reasonable inferences in favor of the plaintiff," Daniel v. T & M Prot. Res., Inc., 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, in adjudicating a Rule 12(c) motion, a court may consider the pleadings, their exhibits, statements or documents incorporated by reference in the pleadings, "any matter of which [the court] can take judicial notice," and documents "integral" to the complaint. 120 Greenwich Dev. Assoc., L.L.C. v. Admiral Indem. Co., 08 Civ. 6491 (LAP), 2013 WL 12331487, at *4 (S.D.N.Y. Sept. 25, 2013) (alterations and quotation marks omitted) (collecting cases).

B.    Standards Applicable to Insurance Contract Interpretation

Insurance policies are, in essence, creatures of contract, and, accordingly, subject to principles of contract interpretation." Porco v. Lexington Ins. Co., 679 F. Supp. 2d 432, 435 (S.D.N.Y. 2009) (quoting In re Estates of Covert and Another, 97 N.Y. 2d 68, 735 N.Y.S. 2d 879, 761 N.E. 2d 571 (2001) (internal quotation marks omitted)). Under New York law, the interpretation of a contract "is a matter of law for the court to decide." Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir.2002) (internal citation omitted). The Court must interpret a contract's terms "in light of 'common speech' and the reasonable expectations of

a businessperson." Belt Painting Corp. v. TIG Ins. Co., 100 N.Y .2d 377, 383, 763 N.Y.S .2d 790, 795 N.E. 2d 15 (2003) (internal citation omitted).

        In addressing an insurance contract dispute the Court considers two separate questions: (1) whether the provision at issue is unambiguous as a matter of law and, if so (2) what the plain and ordinary meaning is, when applied to the facts of the pending case. Lonstein Law Office, P.C. v. Evanston Ins. Co., 2022 WL 311391, at *8 (S.D.N.Y. Feb. 2, 2022). When insurance contracts contain an exclusion provision, "'[t]he insurer generally bears the burden of proving that the claim falls within the scope of an exclusion ... [by] establish[ing] that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case.'" Seneca Ins. Co. v. Kemper Ins. Co., No. 02 Civ. 10088 (PKL), 2004 WL 1145830, at *10 (S.D.N.Y. May 21, 2004) (quoting Vill. of Sylvan Beach v. Travelers Indem. Co., 55 F.3d 114, 115–16 (2d Cir.1995)), aff'd, 133 F. App'x. 770 (2d Cir. 2005) (summary order); see also Seaboard Sur. Co. v. Gillette Co., 64 N.Y.2d 304, 311, 486 N.Y.S.2d 873, 476 N.E.2d 272 (1984) (stating that exclusions "are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction" (internal citation omitted)). "Where an exclusion lists more than one type of relationship to the actions for which coverage is sought and is separated in the disjunctive—by use of the word 'or'—the insurer need not show that every relationship is unambiguous and applicable so long as one relationship is unambiguous and applicable." Quanta Lines Ins. Co. v. Investors Capital Corp., No. 06 Civ. 4624 (PKL), 2009 WL 4884096, *20 (S.D.N.Y. Dec. 17, 2009) (citing Pereira v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 525 F. Supp. 2d 370, 376 (S.D.N.Y. 2007) ("[T]he particular structure of the prior litigation exclusion in the [insurance] policy does not require [the insurer] to demonstrate that every term in the clause is unambiguous. The exclusion clause

lists *many* possible relationships that [the litigations] may have to one another such that the ... judgment would be barred from coverage, and it does so with the use of the critical conjunction 'or.'" (emphasis in original))), aff'd sub nom. Quanta Specialty Lines Ins. Co. v. Investors Capital Corp., 403 F. App'x 530 (2d Cir. 2010) (summary order); see also Zunenshine v. Executive Risk Indem., Inc., No. 97 Civ. 5525 (MBM), 1998 WL 483475, at *5 (S.D.N.Y. Aug. 17, 1998) (claims related where they arise out of 'any fact, circumstance, situation, transaction, event or Wrongful Act') (internal citation omitted)), aff'd, 182 F.3d 902 (2d Cir. 1999).

II.    Disposition of the Motions

   A.    The Related Claims Clause Bars Coverage Under The 2019 D&O Policy

Ironshore argues that the Northwell Actions are related claims within the meaning of the 2019 D&O Policy. Thus, it is argued that the claim made by commencement of the Second Northwell Action was first made when the First Northwell Action was commenced - during the policy period of the 2018 D&O Policy. It is therefore argued that no coverage exists under the 2019 D&O Policy, and that Plaintiffs' notice in March of 2020 was not made within the proper D&O Policy coverage period. To analyze this argument in accord with the standards above, this Court must address separately: (1) whether the related claims provision is unambiguous as a matter of law and, if so; (2) what the plain and ordinary meaning of that provision is when applied to the facts of the pending case. Lonstein, 2022 WL 311391 at *8.

Turning first to the question of ambiguity of the related claims provision, the Court finds none. This is in accord with the holding of the Second Circuit in Nomura Holding Am., Inc. v. Federal Ins. Co., 629 F. App'x 38 (2d Cir. 2015) (summary order). In Nomura, the Second Circuit agreed with the District Court's decision that an almost identical related claims provision was unambiguous. See Nomura, 45 F. Supp. 3d 354, 364 (S.D.N.Y. 2014). There, the policy

language defined "Related Claims" as "all Claims for Wrongful Acts based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events." Nomura, 45 F. Supp. 3d at 360. The Related Claims Provision here defines a Related Claim as "all claims for Wrongful Acts based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events, whether related logically, causally or in any other way . . .". DE [27-4] at 13-14. Applying Nomura, the Court holds that the related claims provision is unambiguous as a matter of law. Accord Lonstein, 2022 WL 311391 at *8; see also Zahler v. Twin City Fire Ins. Co., 2006 WL 846352, at *6–7 (S.D.N.Y. Mar. 31, 2006) (holding that "Interrelated Claims" provision of insurance policy is unambiguous and ruling in favor of insurer).

Plaintiffs' reliance on David v. Am. Home Assurance Co., 1997 WL 160367 (S.D.N.Y. Apr. 3, 1997) is misplaced as outdated in light of the Second Circuit's decision in Nomura. Contrary to Nomura, that case held that terms such as "the same" and "related" were "so elastic, so lacking in concrete content" so as to "import into the contract ... substantial ambiguities." David, 1997 WL 160367, at * 3, citing McCuen v. Am. Cas. Co., 946 F.2d 1401, 1407-08 (8th Cir. 1991). The court in David further held that the issue of ambiguity was not properly resolved in the context of a motion to dismiss. Id. In light of the more recent holding in Nomura, this Court must respectfully disagree with David, and adhere to its holding of non-ambiguity. Accord Lonstein, 2022 WL 311391 at *7 (deciding the issue of ambiguity in the context of a motion to dismiss post-Nomura).

Turning to the second question, i.e., whether the Northwell Actions are related within the meaning of the 2019 D&O Policy, the Court holds that they are. In reaching this conclusion the Court has engaged, as instructed by Nomura, in a "side-by-side review of the underlying claims." Nomura, 629 F. App'x at 40. This review reveals that the claims in both lawsuits do, indeed, fall within the Related Claims Provision of the 2019 D&O Policy, as they arise out of the "same or related facts, circumstances, transactions or events." To be clear, the claims all arise out of the allegation that QHPNY failed to pay Northwell for health care rendered to QHPNY members. The underlying facts alleged in the Northwell Actions are the same, as is the precise amount alleged to be owed to Northwell.

While it is true, as Plaintiffs note, that the legal theories alleged in the Northwell Actions are different, this does not alter the conclusion that the cases are related within the meaning of the 2019 D&O Policy. Nor does the fact that while QHPNY is named as the only Defendant in Northwell I, the Individual Plaintiffs and related corporate entities are named in Northwell II. Here, as in other cases applying related claims provisions, the critical question is not the legal theories alleged, but whether the claims arise out of a single or related set of Wrongful Acts. They do. See Nomura, 45 F. Supp. 3d at 370 (holding claims related where they "contain[ed] overlapping (and frequently identical) factual allegations, arising from strikingly similar circumstances, alleging similar claims for relief"), aff'd., 629 F. App'x at 39–40 (affirming District Court grant of summary judgment for insurer "for substantially the same reasons set forth by the district court" and concluding that claims were related); Lonstein, 2022 WL 311391, at *10 (focusing on factual nexus between claims asserted to be related and not on legal theories); Zunenshine v. Exec. Risk Indem. Inc., 1998 WL 483475, at *5 (S.D.N.Y. Aug. 17,

1998) (related claims need not "involve precisely the same parties, legal theories, Wrongful Acts, or requests for relief").

In sum, this Court has no doubt that the Second Northwell Action is "based upon," arises out of," is "in consequence of" or "in any way involves" the "same related facts, circumstances, situations, transactions or events" as those alleged in the First Northwell Action. This is because both actions stem from Plaintiffs' conduct that renders Northwell unable to collect amounts due pursuant to the same contractual obligations. For this reason, the Northwell Actions are related within the meaning of the Related Claims Provision. Since the 2019 D&O Policy is a "claims made" policy, and the Second Northwell Action is related to the First Northwell Action, the claim was first made during the 2018 D&O Policy coverage period. There is therefore no coverage under the clear and ambiguous terms of the 2019 D&O Policy, and coverage must be analyzed only under the 2018 D&O Policy's terms of coverage and exclusions.

B.     Coverage Is Excluded Under The 2018 D&O Policy: The Insolvency Exclusion

This Court has determined that the Northwell Actions are related claims and there is no coverage under the terms of the 2019 D&O Policy. Additionally, the declaration of coverage sought is barred by both Policies' common insolvency exclusion. To be clear, this is true without regard to which D&O Policy is analyzed; the same exclusion applies.

The insolvency provision of the Policies expressly state, in relevant part, that

no coverage will be available under this Policy for Loss, including Defense
Expenses, from any Claim based upon, arising out of, directly or indirectly
resulting from, in consequence of, or in any way involving any actual or alleged:

(1)     insolvency, bankruptcy, conservatorship, rehabilitation, receivership,
liquidation, or financial inability to pay of:

(a) any Insured acting as an insurer or reinsurer; or

> > (b) any other insurer, reinsurer, self-insurer, third party payor, managed care organization, health care plan, or other person or entity; or

> (2) financial inability of any Insured to perform Managed Care Services.

Pls.' Mot., Endorsement No. 4 (hereinafter the "Insolvency Exclusion").

Relying on the Insolvency Exclusion, Ironshore argues first that the Second Northwell Action alleges that QHPNY was acting as an insurer. See Pls.' Mot., Second Northwell Action Am. Compl. ¶¶ 29-30, DE [27-7]. Ironshore next points out that the Second Northwell Action alleges that QHPNY was insolvent or otherwise financially unable to pay Northwell. Specifically, Ironshore notes that Northwell alleges that "at all times from 2014 through year end 2019, [QHPNY did not have] a positive net worth." Id. ¶ 38. It is further alleged in the Second Northwell Action that individual plaintiffs stripped QHPNY's assets so that it would be judgment proof and unable to pay its bills. See id. ¶¶ 58-67. Thus, Ironshore concludes that the Second Northwell Action falls under the Insolvency Exclusion, and there is therefore no coverage under either of the Policies.

Plaintiffs do not dispute the allegation that QHPNY acted as an insurer in connection with the debt asserted in the Second Northwell Action. Clearly, the debt was incurred when Northwell rendered health care services to those insured under QHPNY contracts of insurance. Plaintiffs dispute only Ironshore's position that the claims alleged in the Second Northwell Action are, as required for application of the Insolvency Exclusion, "based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged insolvency, bankruptcy, conservatorship, rehabilitation, receivership, liquidation, or financial inability to pay." In support of their position Plaintiffs point out that QHPNY was not put into New York State liquidation proceedings until after commencement of the Second Northwell Action.

Acceptance of Plaintiffs' argument would require the Court to apply an exceedingly narrow interpretation to a clearly broad exclusion, which the Court cannot do. The Court is mindful of the standard outlined above which requires that Ironshore bear the burden of establishing that the exclusion is "stated in clear and unmistakable language, is subject to no other reasonable interpretation" and applies to the facts herein. Seneca Ins. Co., 2004 WL 1145830, at *10 (S.D.N.Y. May 21, 2004). Nonetheless, the Court holds that the insurer's burden is met here.

Instructive to the decision here is Coregis Ins. Co. v. Am. Health Found., 241 F.3d 123 (2d Cir. 2001), a declaratory judgment case where application of an insolvency exclusion under Connecticut law was dispositive. There, the insurer claimed that the lawsuit for which coverage was sought "would not have been brought but for the insolvency" of the relevant companies. Coregis,, 241 F.3d at 126. The District Court rejected this argument, but the Second Circuit reversed, holding that the insolvency exclusion barred coverage. Coregis, 241 F.3d at 128. Focusing on the language encompassing claims "related to" insolvency, the Second Circuit held coverage to be barred. Id. Notably, the Second Circuit in Coregis cited and discussed with approval the broad application of an insolvency exclusion in Lexington Ins. Co. v. American Healthcare Providers, 621 N.E.2d 332 (Ind. Ct. App. 1993). There, like here, plaintiffs sought coverage under an Officers and Directors policy, and the insurers sought a judgment excluding coverage under an insolvency exclusion. Coregis, 241 F.2d at 130. In Lexington, the lawsuit for which coverage was sought alleged breach of fiduciary duty by directors who failed to take steps necessary to preserve the assets of their company, even after they knew of the company's failing financial condition. Id. A broad insolvency exclusion, like the exclusion at issue here, applied and barred coverage. Because the officers and directors were alleged to have been

"unquestionably involved in the insolvency," and because acts that led to or caused the insolvency also "involved" the insolvency, the exclusion applied.

Similarly, and arguably more broadly here, the insolvency exclusion in the Policies bars from coverage claims "based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged insolvency, bankruptcy, conservatorship, rehabilitation, receivership, liquidation, or financial inability to pay . . . ." Pls.' Mot., Endorsement No. 4 (emphasis added). The Court holds that even when applying the stringent standards of New York law the exclusion unambiguously applies to the facts alleged in the Second Northwell Action.

This holding is supported not only by the Second Circuit's decision and language in Coregis, but also by the holding of the Appellate Division of the New York State Supreme Court in Kleneic v. White Lake Marine Corp., 144 A.D. 2d 341, 533 N.Y.S. 2d 909 (N.Y. App. Div. 1988). While the insurer there was not entitled to rely on the insolvency exclusion due to its late assertion of reliance thereon, the court construed the exclusion as clear, broad and not limited only to claims for contribution or indemnity. There, as here, the policy excluded coverage for "any claim arising out of or in connection with the financial inability to pay, insolvency, receivership, bankruptcy or liquidation of any insurer." See id. at 910. The New York court found this language to be "clear and broad" and that it covered the claim at issue. See id. This case involves an uncomplicated application of a broad insolvency exclusion. QHPNY's insolvency and the alleged acts of the individual Plaintiffs and their related entities in connection therewith (and not only QHPNY's entry into formal liquidation proceedings) is the entire basis and reason the Second Northwell Action was filed. Northwell could not recover on its first action because QHPNY was insolvent. The Second Northwell Action involves the alleged insolvency

of QHPNY, which was acting as in insurer. There is no question but that the Second Northwell Action arises out of QHPNY's financial inability to pay its debts. Therefore, Ironshore has demonstrated that the Second Northwell Action is based upon, arises out of, results from, or in any way involves, insolvency or a financial inability to pay. See Endorsement No. 4. Thus, the Insolvency Exclusion bars coverage of the Second Northwell Action. Accordingly, under either of the D&O Policies, coverage is barred by the Insolvency Exclusion. Accord Associated Community Bancorp, Inc. v. The Travelers Co., Inc., 2010 WL 1416842, at *5 (D. Conn. 2010) (applying insolvency exclusion that included all claims arising out of insolvency under Connecticut law); Employers Ins. v. Tri World Ins. Agency, 1998 WL 23677 (9th Cir. 1998) (applying insolvency exclusion under California law); St. Paul Fire & Marine Ins. Co. v. Cohen–Walker, Inc., 171 Ga. App. 542, 544-45, 320 S.E. 2d 385 (Ga. Ct. App. 1984) (applying provision excluding "claims resulting from the inability of an insurance company to pay its debts" in lawsuit alleging negligence as encompassing company's insolvency).

III.   Remaining Arguments

Ironshore raised the applicability of additional policy exclusions in both its letter declining coverage and herein, including the Managed Care and Contract exclusions. Certain grounds, such as that based on the identity of insured persons, are not raised by way of the present motions, and therefore not now amenable to disposition. However, in light of the Court's recommendation that Ironshore's motion be granted - which applies to all Plaintiffs in this matter and all Defendants in the Underlying Litigation, whether either or both of the Policies apply, it is unnecessary to address any additional arguments. Ironshore is entitled to the declaratory judgment it seeks.

CONCLUSION

For the foregoing reasons, this Court respectfully recommends that Plaintiffs' motion for judgment on the pleadings, found at docket entry No. 27 herein, be denied, and Defendant's motion for judgment on the pleadings, found at docket entry No. 28 herein, be granted. Specifically, this Court recommends that the Court declare that Ironshore is not obligated to defend Plaintiffs with respect to the Second Northwell Action.

OBJECTIONS

A copy of this Report and Recommendation is being provided to all counsel via ECF. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of filing of this report. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or Court of Appeals. Thomas v. Arn, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision").


Dated: Central Islip, New York
       February 27, 2023

                                         /s/ Anne Y. Shields
                                        Anne Y. Shields
                                        United States Magistrate Judge